WATTS *v.* THE RICHMOND & DANVILLE RAILROAD COMPANY.

Where by mutual consent, evidenced by practice and by acquiescence therein with knowledge on the part of the superintending officers, two railway companies having their tracks adjacent and parallel, on some of which cars in large numbers are habitually left standing, permit the watchmen employed by the companies

respectively to walk and stand upon the unoccupied tracks of each other, including the main lines, for the purpose of examining the standing cars with a view to take and report the initials and numbering inscribed thereon, a watchman while so employed and deporting himself in the usual way recognized as fit and proper by both companies, is not a trespasser upon the track of the company which did not employ him, any more than he is a trespasser upon the track of his own company. He is not a trespasser at all. And if, by the negligent and too rapid running of a train of the other company, he is suddenly stricken and injured, failing to protect himself in consequence of his attention being occupied with his duties, it is a question for a jury whether under all the circumstances he could have avoided the consequences of the company's negligence by the exercise of ordinary diligence. If he could not, he might recover ; but if he could, he would have no cause of action. The court erred in granting a nonsuit. *Georgia Railroad* v. *Pittman*, 73 *Ga.* 325.     *Judgment reversed.*
May 16, 1892. By two Justices.

Railroads.    Negligence.    Nonsuit.    Before Judge VAN EPPS.    City court of Atlanta.    December term, 1891.

Watts sued the Richmond and Danville Railroad Company, as lessee of the Georgia Pacific Railway Company, for damages from personal injuries. A nonsuit was granted, and Watts excepted. From his testimony and that of one Jones who was with him at the time of the casualty and was himself hurt, the following appears : They were night-watchmen for the Western & Atlantic railroad, and were on duty between the Emma street crossing in the city of Atlanta, and the Bellwood crossing just outside the city. They were within the city limits, about 150 yards from Emma street, and about 400 yards from Bellwood crossing. It was about 11 o'clock at night. Watts was taking the numbers of cars for the W. & A. road. The numbers of cars are on the sides near the top. He had to take the initials of the cars, their numbers and class, which he wrote down on paper. He had a lantern. He was standing, at the time defendant's train struck him, on the Georgia Pacific main track. He could not take the numbers with-

out standing there, because that track and the track of the W. & A., on which were the cars of which he was taking the numbers, are so close together that one could not go between and take the numbers; and he could not stand on the other side of the Georgia Pacific track and see the numbers. When he was struck he had taken the number of one car, and had just turned and started towards the city, the direction from which the train which struck him approached, to the next car. He got no warning. There was no bell rung, nor whistle blown. The train which struck him was not on time, and was running from 20 to 25 miles an hour. The engineer could have seen a man on the track, at the point in question, 50 or 75 yards ahead of him, and if Watts had been on the lookout for the train he could have seen it for that distance, but at the time a W. & A. train was coming in up grade and making a noise. Before Watts was struck he saw the train which struck him about 10 or 12 steps away, and tried to jump, but did not succeed because the engine was running too fast. As night watchman he took the numbers of the cars and watched the cars to keep them from being broken open, his beat commencing at Emma street and extending below Bellwood crossing. At times Jones did talk to him when he was not taking the numbers of the cars. Plaintiff got the lantern from a little railroad house of the W. & A., which was across the Georgia Pacific track on the Georgia Pacific side, and the watchmen had to cross the Georgia Pacific track up in that neighborhood to get things out, and always crossed the track to get them. Watts was using the lantern for the purpose of writing the numbers of the cars on a list. The main line track in question was used by both the Georgia Pacific and East Tennessee roads and a number of trains passed over it, about one an hour. The place where plaintiff was hurt was a public place for night watchmen and

railroad men of the Georgia Pacific and W. & A., and there were many of them along there, and a number of tracks of both roads. It was an agreement between the watchmen of the W. & A. and the Georgia Pacific to "reciprocate watching courtesies," that is, the W. & A. watchmen would watch the G. P. cars, and *vice versa.* At the point in question the tracks were about 8 feet apart; cars would extend over about 4 feet, thus leaving about 4 feet clear. Jones did not see the approaching train until it was within 10 or 12 feet, and only saw it then because they had turned to go to another car. When he saw the engine he tried to get out of the way, but could not because it was running too fast.

One witness testified: He was on the engine when it struck plaintiff and Jones. When they were struck he was sitting on the fireman's side, and the fireman was in the gangway stirring up his fire or doing something, and did not see them struck. Witness saw them about 75 yards before they were struck, but nobody did anything to stop the engine. He just holloed, "Lord, yonder is two men!" and by that time the engine had hit them and gone by. The engine was running at the rate of 25 or 35 miles an hour. No bell was rung nor whistle blown, nor any alarm given. The engineer reached for his whistle, but by the time he reached it they had been struck. The train was about four hours late, and no signal was given as the Emma street crossing was neared, or between that crossing and the next, although between these crossings there was a blow-post. The engineer did not check or keep checking the engine before reaching either of the crossings. To take the numbers of the cars on the storage track one would have to stand on the main line of the Georgia Pacific. Witness saw the light which plaintiff had, and any one who looked from the engine could have seen it. If the train had been going 12 miles an hour, it could have

been stopped in 100 feet; if 6 miles an hour, in 30 feet. When witness first saw plaintiff and Jones, they were standing in the middle of the track sidewise to the engine, looking up on the cars, and appeared to be writing. Employees are accustomed to use that track at night. Railroad men were allowed to go through the Georgia Pacific yard at any time of night, etc. Another witness testified that the train was running 25 or 35 miles an hour, and no signal was given; that it is customary to take down the numbers of the cars on the south side, because they are marked on that side, and in taking those numbers one cannot well stand between the Georgia Pacific and the storage track of the W. & A., as it is so close one would have to look straight up, and the lantern would not give sufficient light, and if he got on the other side of the main line the light would be too dim, and so he would have to stand on the Georgia Pacific main line; that the W. & A. freight-train was making a "heap of fuss"; a train heavily loaded coming up grade makes a terrible racket; that if one were right by a train coming up grade it would cut him off from hearing a train going down grade (defendant's train was going down grade); that at the place where plaintiff was struck a number of employees were in the habit of going up and down the track to and from their work at night; that at that point one standing in the middle of the Georgia Pacific track and looking towards the city, could see about one hundred yards down the track, and could see an engine headlight further than 100 yards; that it does not necessarily require two men to take the numbers of the cars, but at night it is more convenient, for one man can hold the light and the other go along taking numbers. The assistant superintendent of the W. & A. railroad testified: The greater portion of the Georgia Pacific track in Atlanta was laid within the marks or boundaries

of the W. & A. railroad, that portion between Bellwood crossing and Emma street varying from three to five feet. Where plaintiff was hurt the Georgia Pacific track was on the regular right of way of the W. & A. railroad. It was a common practice of the two roads to go on each other's tracks to hunt for cars or to get numbers, particularly the main line where they were generally open. The side-tracks at that time of the year were badly crowded with cars. It was the common practice to walk down the tracks to get the numbers of the cars, and almost absolutely necessary to walk on some other track besides those the cars were on. It was the practice all the time of both roads. As assistant superintendent witness knew that the practice existed, and did it time and again himself, and the Georgia Pacific people knew of it. The Georgia Pacific yardmaster, Turner, who managed the handling of cars, knew of it; witness had seen him down there very often; the local agent of the Georgia Pacific, who had charge of the tracks and their use in handling the train, did not go down these tracks, but saw "us" down there very often, and witness had met him there and talked about the condition of affairs there, and in regard to using each other's tracks. There was a practice for the roads to use the tracks of each other for storing cars where there were vacant spaces, but these transactions generally took place nearer the city and not at Emma street, Bellwood or beyond. At the point of this accident there was no transaction of business, and witness in his testimony was talking about Simpson street, which was about 1,500 yards away. It was a common practice for the employees of one road to go on to the track of the other to transact business, for the reason that the main line was generally pretty clear of cars. In the night-time an employee with a good lantern, if on the other side of the Georgia Pacific track, could

read the numbers of the cars, looking across the main line of the Georgia Pacific. The duty imposed upon watchmen by the W. & A. was to take the numbers of cars, and they were expected to look at each car and to examine the seals. Examining the seals at night involved the going up to the door, and they would have to take a lantern and go to the car-door to get the seal, the number of the seal and its condition, and in getting the seal the watchman was expected to take the number of the cars; this was to see that the car was not broken open when received. A seal is made of lead about the size of a nickel, and impressed with the number and initial of the road sealing it. It is not possible at night to get this number without getting right up to it. It would be necessary for the watchman to walk down immediately next to the cars and take seal after seal as he went along, and examine it. He could not walk upon the main line of the Georgia Pacific and do that. If a freight-train of the W. & A. were coming into town at the speed usually run by freight-trains on the W. & A. at that point, and the Georgia Pacific was coming out at 25 or 30 miles an hour, and the W. & A. were abreast of the watchman, he would hardly hear the Georgia Pacific train. If the W. & A. train was approaching from the opposite side he could not hear the Georgia Pacific train a very great distance, probably a few hundred yards. Assuming the man to be watching and his attention attracted to the train, he could hear it a few hundred yards. If the man who was trying to see the numbers had just an ordinary lamp furnished by the railroad for that purpose, and it was a rainy, dark night, witness thought he could stand across the Georgia Pacific track and read the numbers. So far as he knew, all employees are furnished with good lamps and good materials and are required to keep their lamps in good condition. The distance one could see the

number of a car depends upon the distinctness with which it was written on the car, and as a general thing they are distinct, though sometimes defaced, etc. A yard-master for the W. & A. railroad testified: He had never heard of any orders against the employees of either of the roads walking on the track of either, passing among the tracks. The watchman in that portion of the road would take the number of the loaded cars between Emma street and Bellwood. He did not take the seals but could tell whether the car was secure or not, examining it, and if the door was open, would report it. With cars standing on the track next to the Georgia Pacific main line at night, a man could not get the number if he just had an ordinary lamp, such as were furnished W. & A. watchmen, without holding the lamp so he could see the number. He would have to get back a reasonable distance so that the light would shine on it, and he could stand between the tracks in some places but in others he could not. He would generally get on the main line of the Georgia Pacific, on the end of the ties, so that he could see the numbers, and witness did not think he could stand across the Georgia Pacific main line and see the numbers on a dark night. It would have to be a very good lamp. Turner, the yard-master of the Georgia Pacific at that time, sometimes walked on the tracks with witness and they saw other employees walking on the tracks. The yard-master of the Georgia Pacific was in that part of the yard and saw the W. & A. men using the tracks; it occurred often, and no objection was made. The night yard-master of the W. & A. railroad, who had held that position for 18 or 19 years, testified, that at night with a good light and bright numbers one could stand across the Georgia Pacific main line and take the number, but with the ordinary run of numbers could not, and could not stand between the tracks and take them; that the

way witness had always done was to stay on the main track, because it threw him on a level with them and he could see them better; that the employees walked on " each other's road, the same as if we were out in a big road, and feel that we have a right to"; that this had been the practice witness could not tell how long, ever since the railroad was built, he guessed; that it was necessary for employees to get on "each other's tracks" to take the numbers of the cars, and they paid no attention to being on another's territory; that that practice had been in existence ever since the railroad was built, witness guessed; that it was not the duty of the watchman to take the numbers of the seals, but he had to see that they were all right and unbroken, and at 10 or 11 o'clock at night for a watchman with his lamp to see whether one was broken he would have to get close to it; that it was his duty to keep the lamp in order, etc.; that it had been the habit down there for watchmen of the W. & A. road to use the Georgia Pacific track in taking numbers of cars and things of that sort, ever since they had been there as watchmen, that is, for four or five years. There was much other evidence, not varying materially in effect from that stated above; also, evidence as to the nature of the injuries inflicted; also, an ordinance of the city of Atlanta, forbidding the running of trains within the city limits at a greater rate of speed than six miles an hour, under penalty of fine or imprisonment or both. It was admitted by defendant that it is and was at the time of the injury operating the Georgia Pacific railroad under a lease.

GLENN & SLATON, for plaintiff.

HENRY JACKSON and EMMETT WOMACK, for defendant.